# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 3:12CR93(VLB) |
| DEAN DEPRETA | : | September 27, 2013 |

_____

### GOVERNMENT'S MEMORANDUM IN RESPONSE
### TO DEFENDANT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in response to the sentencing memorandum of Dean DePreta (or "the defendant") which was filed on September 19, 2013 [doc. 740], for the sentencing scheduled for October 9, 2013, at 2:30 p.m.  In his memorandum, the defense has recommended a sentence of 63 months of imprisonment.  The government respectfully submits that a custodial sentence of 78 months of imprisonment would achieve the objectives of incapacitating, punishing, and deterring a defendant who returned to his criminal livelihood, while still on supervised release, soon after serving a 39-month custodial sentence for 2002 federal convictions for extortion, operating an illegal gambling business, and tax fraud.  In January 2002, the sentencing judge warned the defendant that he had a stark choice before him: he could either commit himself to his biological family and live a law-abiding life or he could return to organized crime with the Gambino Family of La Cosa Nostra.

Sadly for society and his biological family, DePreta chose the latter path. The evidence in this case demonstrates that he has matured into a seasoned, calculating criminal with supervisory responsibilities and an elevated status for the Gambino Family in southern Connecticut.  During this investigation, he extortionately collected tribute payments, commonly referred to as "street taxes," from independent bookmakers operating in Fairfield County.  Just as important,

DePreta led multiple Gambino-controlled gambling businesses in southern Connecticut between 2008 and 2012, including a lucrative Internet-based sports bookmaking operation and three gambling clubs in Stamford and Hamden. During this investigation, the defendant had regular meetings with "made men" of the Gambino Family, and even told a Gambino Solider, who was cooperating at the time with the government, that the defendant was "looking out for the principles of the Family."  In sum, due to his extensive, escalating involvement in organized crime during the past two decades, the defendant's poses a extremely high risk of recidivism.  Accordingly, the government respectfully submits that a term of imprisonment of 78 months is a just sentence consistent with 18 U.S.C. § 3553(a) that will achieve the sentencing objectives of incapacitation, punishment, and deterrence.

I.    The Defendant's Criminal History

DePreta's first reported encounter with law enforcement was a 1997 arrest for Threatening and Breach of Peace brought against him and his father, Vincent DePreta ("Vincent").[1]  *See* Presentence Report ("PSR") ¶ 10.  On August 8, 1997, Vincent DePreta was party to a "road rage" incident with an auto parts delivery man.  Vincent DePreta approached the victim and said, among other things, and that his son (Dean DePreta), would come over to rearrange the complainant's face, so that "his parents wouldn't recognize him."  *Id*.  Shortly thereafter, the defendant, Victor Amereno (a co-defendant in this prosecution), and a third male showed up at the victim's place of work.  The defendant stated, among other things, "I don't give a fuck about witnesses; you talk to my father that way, I'm

---

[1]  A summary of this police report appears in Paragraphs 28-32 of the PSR in *United States v. Vincent DePreta*, Case No. 98CR19(PCD), in which Vincent DePreta pleaded guilty to operating an illegal sports gambling business.

going to rearrange your face." *Id*.  Dean DePreta and the two males said they
would "take him for a ride," so the victim could apologize to Vincent DePreta and
then get beat up by them.  The victim was so frightened that his supervisor at the
auto parts store placed him in a locked room to protect him.  When later
questioned by federal probation for his presentence interview, Vincent denied
being the aggressor of this incident and stated that it was his son, Dean DePreta,
who took it upon himself to get an apology on Vincent's behalf.  *Id*. (referencing
paragraph 31 of Vincent DePreta's PSR).  The defendant paid a $60 fine to resolve
this criminal matter in state court.

In 2002, DePreta was sentenced to a term of incarceration of 39 months for
Collecting an Extension of Credit by Extortionate Means in violation of 18 U.S.C. §
894; Operating an Illegal Gambling Business in violation of 18 U.S.C. § 1955; and
Failing to File a Tax Return in violation of 26 U.S.C. § 7206(1).  PSR ¶ 11.  As
stated in his 2002 PSR, this conviction was based on the defendant's involvement
from January 1997 through June 2001 in an illegal sports bookmaking business
in Stamford with, among other individuals, Nicola Melia, Michael Gentile, Elliot
Chiappetta, William Forte, and Steve Maccagnano.[2]  In connection with operating
this bookmaking business, the defendant and Gentile threatened a losing sports
bettor with violence to induce the payment of a $40,800 debt.  *Id*. (referencing
PSR ¶ 12 of the defendant's 2002 PSR).  In threatening the victim, DePreta stated,
among other things, "I've cracked people for fuckin' $2,000"; "We're trying to be
nice about [collecting the debt].  Normally we would come in and just fucking

---

[2]  These five individuals have all been convicted of federal crimes: Nicola
Melia – racketeering (Case No. 3:04CR28-JBA) and extortion (Case No. 3:11CR60-
JBA); Michael Gentile – illegal gambling business (Case No. 3:01CR171-AHN);
Elliot Chiappetta – illegal gambling business (Case No. 3:03CR30-EBB) and
narcotics distribution (Case No. 3:12CR131-JCH); William Forte – illegal gambling
business (Case No. 3:03CR30-EBB); and Steve Maccagnano – illegal gambling
business (Case No. 3:03CR30-EBB).

wipe this place and leave, but we don't want to do that." *Id*. (referencing PSR ¶¶ 15, 16 of the defendant's 2002 PSR).

At one point, DePreta and Gentile suspected that the victim was cooperating with federal authorities.  DePreta and Gentile searched the victim's apartment and checked him for a recording device.  *Id*.  After finding notes in the victim's briefcase, the defendant told the victim, "You got a big problem . . .  what the hell are all these notes . . . Witness Protection Program."  *Id*.  (referencing PSR ¶ 21 of the defendant's 2002 PSR).  DePreta demanded, "You working with the Feds?"  At the time, the victim was wearing an audio recording device that was being monitored by the FBI agents nearby.  The victim replied audibly in the affirmative to let the monitoring FBI agents know that his "cover had been blown," and his life was in grave danger.  Gentile moved to stab the victim with a scissors, but the defendant prevented him from doing so, saying "[The Feds] are probably outside."  *Id*.

On July 2, 2001, the defendant pleaded guilty to extortion, operating an illegal gambling business, and tax fraud.  As part of this case, DePreta admitted that he had under-reported his taxable income by approximately $99,000, with an expenditure of $52,000 spent on remodeling his home at 59 Bartina Lane in Stamford, including $10,400 on plumbing, $12,000 on marble flooring, and $8,400 on new appliances.  PSR ¶ 11.

II.    The Instant Offense Conduct

DePreta resumed his criminal activities with the Gambino Family while he was on supervised release in mid-2006.  In connection with his instant guilty plea, DePreta has admitted to conspiring to commit three racketeering acts between January 2008 and February 2012: (1) extortion in violation of Conn. Gen. Stat. §§ 53a-122 and 53a-119(5); (2) the operation of a lucrative, large-scale sports

4

bookmaking business; and (3) the operation of a card gambling club located at 2965 State Street, Hamden, Connecticut.  The evidence also substantiates his role in operating the two card gambling clubs at 859 East Main Street and 614 Glenbrook Avenue in Stamford, Connecticut.  PSR ¶ 12.

A.   **Conspiracy to Commit Extortion in Violation of C.G.S. §§ 53a-122 and 53a-119(5)**

DePreta and others collected tribute payments from independent sports bookmakers operating in Gambino territory in Fairfield County.  The size of the tribute payment would depend on the size of the bookmaker's betting operation.  Among the government's most compelling evidence of this extortionate conduct were the tribute payments made to him by Victim One.  PSR ¶ 13.  DePreta collected these payments between January 25, 2010, and April 29, 2010, with the involvement of Nicholas Stefanelli, a Gambino Soldier cooperating with the government until his death in March 2012.  In addition, DePreta directed co-defendant Richard Uva to collect a tribute payment from Victim One on January 6, 2011.

On various audio recordings, DePreta coerced Victim One to make tribute payments to him.  PSR ¶ 14.  Extremely fearful for his safety, Victim One complied with DePreta's demands, knowing that DePreta was associated with organized crime and had been to prison.[3]  DePreta and Stefanelli agreed that they would pocket their share and "whack up" a portion of the collected funds to their Gambino Family superiors in New York.  In a recorded statement, DePreta told Stefanelli that DePreta fervently believed in the principles of the Gambino Family, and appreciated that he was being treated well by Soldier Mario Antonicelli.  *Id.*

_____

[3]  Had DePreta proceeded to trial, additional witnesses other than Victim One would have testified pursuant to subpoena regarding DePreta's collection of extortionate payments from independent bookmakers operating in Fairfield County.

### 1.  Extortionate Collections from Victim One

Victim One was an independent bookmaker in Fairfield County who had previously made tribute payments to a Gambino associate named John Bauco. PSR ¶ 15.  Bauco and his partner, Raul Suner, were convicted of Racketeering Conspiracy and sentenced to imprisonment in 2008 (Case No. 09CR107-AVC).  On January 9, 2010, DePreta, Stefanelli, and an individual named Anthony Natalizio discussed independent bookmakers in the area who had paid Bauco or Suner before those men were prosecuted and incarcerated.  On the recording, DePreta identified Victim One as a good target to extort payments from, stating that Victim One was "the bargain," "a decent kid, quiet," "easy pickings,'" and "[h]is family got money."  DePreta and Stefanelli then made plans to meet with Victim One and his gambling partner.  *Id*.

On January 18, 2010, Victim One and his gambling partner met with DePreta and Stefanelli at a diner in Southport, Connecticut.  DePreta and Stefanelli told Victim One that they knew of Victim One's sports bookmaking business, and demanded that he pay tribute.  PSR ¶ 16.  DePreta stated, among other things, that "I heard you took care of John [Bauco]"; "I heard you [Victim One] were doing this," while holding up five fingers to signify that Victim One's tribute payment amount would be $5,000.  DePreta then told Victim One, "Just get me something for Christmas."  *Id*.  On January 25, 2010, Victim One delivered $2,500 in cash to DePreta under the table at the same diner.  PSR ¶ 17.

Victim One was fearful of DePreta and the consequences to his safety if he did not make these tribute payments; Victim One knew that DePreta was affiliated with organized crime and had gone to prison.  In fact, Victim One was so agitated by DePreta that Victim One almost walked into traffic at one of these payment meetings.  PSR ¶ 23.  In short, Victim One felt he had no choice but to make these

6

tribute payments due to the defendant's reputation and affiliation with organized crime.

2. <u>Meeting in January 2010 to Divide Victim One's First Payment</u>

On January 30, 2010, DePreta met at a diner in Paramus, New Jersey, with Stefanelli and Natalizio to split up the $2,500 payment.  PSR ¶ 17.  During this meeting, Stefanelli, DePreta, and Natalizio discussed "whacking up" Victim One's first payment to Stefanelli's Gambino Capo, James "Jimmy Boy" Dellaratta.  Moreover, DePreta stated that Victim One knew that he had to pay more money to DePreta in the future.  *Id*.

> Stefanelli:   **So he gave us 2,500.  What do you want to do with this? What do you'se want to do?  Do you think he's [Victim One] gonna give us more?**
>
> DePreta:   ***I told him he has to. [Victim One] has to do what he has to do.*  You tell me what you want to do.**

DePreta then discussed with Stefanelli how they should divide future tribute payments.  PSR ¶ 18.  Stefanelli stated that he would defer to DePreta's judgment on how the money should be split up.  Both men agreed that each would take his share and reserve a portion from each future collection, so that it could be aggregated and paid to their Gambino Family superiors during the Christmas season.  *Id*.  DePreta and Stefanelli further agreed that this arrangement was preferable to making multiple small payments during the course of a year:

> DePreta:   **Whenever we do, do something [make extortionate collections].  Let's talk about that.**
>
> Stefanelli:   **Well . . .**
>
> DePreta:   **So we know, make it simple and whatever it is.**
>
> Stefanelli:   **We'll see if we get something going (Unintelligible/UI), we just bring it to him at Christmas time.  You follow me?**

DePreta:      I meant around us.

Stefanelli:   Yeah.

DePreta:      Between us.

Stefanelli:   You know what I mean as far, as far as my guy [Dellarata] is concerned.

DePreta:      Yeah.

Stefanelli:   I told him every, every time we do something, we put something on the side, and then at, come Christmas time, we bring him something, you know.

DePreta:      Yeah.

Stefanelli:   All right?  And ah, us, whatever fuck you'se want to whack it up, I could care less. You'se [DePreta] are doing all the work.  Whatever you'se [DePreta] wanna do.

              * * *

DePreta:      I just told them that, I originally talked to them . . . [voices talking over]

Stefanelli:   I'll just tell [Capo] Jimmy [Dellarata], listen.  I put it, we're gonna work together as a team, and what, ah, we'll take care of you and, at Christmas time and, and, take care of Mario [Antonicelli] at Christmas time too.  You know what I'm trying to say?  'Cause even though Bridgeport's mine, I said Dean's doing all the fucking work.  Anthony's here (UI), so I figure that's fair.  I'm gonna run that by him and see what he says.  I don't think they'll be any problems, you know. All right?

DePreta:      All right.

Natalizio:    And now, we'll whack it up and we'll bring you something anytime, you know . . .

Stefanelli:   What'cha wanna do?

DePreta:      You know it doesn't matter to me, I don't know.  It doesn't matter to me.  You tell me.

              * * *

DePreta:      . . . How do you want to whack it up?  This way, you set a percentage now and whatever it is . . .

8

| | |
|---|---|
| **Natalizio:** | **You want, you want to set a percentage?** |
| **Stefanelli:** | **That's the best way.  Yeah, percentage is fine.  How you want to do it?** |
| **Natalizio:** | **25 percent?** |
| **Stefanelli:** | **To me?  All right.** |
| **Natalizio:** | **Is that fair?** |
| **Stefanelli:** | **Yeah, that's fair.** |
| **Natalizio:** | **Is that fair to you?** |
| **DePreta:** | **Fine with me.** |
| **Stefanelli:** | **Okay.** |
| | **\* \* \*** |
| **DePreta:** | **That's all I want to do.  I don't want to be, like, meeting twenty times to settle up 2500 dollars.** |
| **Stefanelli:** | **Yeah.  No, no, no.  25 percent, okay.  All right.** |

Ultimately, for Victim One's $2,500 payment, DePreta, Stefanelli, and

Natalizio agreed that each of them would get $500 from Victim One's payment,

and that $1,000 would be reserved for Capo Jimmy Dellarata.  PSR ¶ 19.  DePreta

was pleased with this arrangement and went to the bathroom in the diner to

count the money extorted from Victim One.  *Id.*

| | |
|---|---|
| **Stefanelli:** | **Why don't we do this, this time.  This way, I'll make them happy because I didn't give them nothing all year . . . . This way I don't have to give them nothing all year. We'll do a nickel [$500] a piece, and I'll bring them a G-note [$1,000] and it's finished for Christmas.** |
| **DePreta:** | **That's fine.** |
| **Stefanelli:** | **All right.  That's all.  I'll bring him a G-note [$1,000] and say this is for you.  They'll be happy and I don't have to fucking see him till next Christmas.  Okay?** |
| **DePreta:** | **That's perfect.** |
| **Stefanelli:** | **And whatever we get from this kid [Victim One] again, it's, we keep that.  You know what I mean?** |

Natalizio:      You start putting it away . . .

Stefanelli:     So, if this kid gives us another 2,500 . . .

DePreta:        And then we'll whack it up.

                * * *

DePreta:        Listen, I didn't even open the envelope [from Victim One].  It's still in my pocket.

Stefanelli:     Yeah.

DePreta:        Before we go, I'll go in the bathroom and take it out (UI).

Stefanelli:     This way, when you see this kid [Victim One], whatever it is, we'll whack it up.  I don't have to go back there and make another trip.

During this meeting, DePreta and Stefanelli discussed how DePreta liked reporting to Gambino Soldier Mario Antonicelli, instead of Soldier Louie Ricco, because Antonicelli would direct his associates, such as DePreta, to make money for the Gambino Family and stay out of the way.  PSR ¶ 20.  Natalizio pleased DePreta by stating that Antonicelli and Ricco liked DePreta.  Stefanelli and DePreta further discussed that if DePreta became a made member, he would report to Capo Louis Filippelli just as Antonicelli and Ricco did.  *Id.*  DePreta further mentioned that he had recently met with Filippelli and liked him.

Stefanelli:     Keep with Mario [Antonicelli].  I got no problem with Mario.

DePreta:        No.

Stefanelli:     I'm mean the other guy is picayune, but Mario [Antonicelli]. . .

DePreta:        Which one?

Stefanelli:     Louie [Ricco], you know.

DePreta:        Nah, no, he's . . .

Stefanelli:     You're dealing with Mario [Antonicelli].  It's good.

DePreta:        No, that's all you have to do.

10

Stefanelli:     Mario [Antonicelli] says, "Go make money."

DePreta:        No, Louie [Ricco] (UI) . . .

Natalizio:      Listen, they love you.

DePreta:        No, you kidding me, both of them?  After they had dinner that day, they were like this guy's the fucking greatest in the world.  No, Louie's . . .

Stefanelli:     Yeah.

DePreta:        I think whatever their relationship is, that's between them [Antonicelli and Ricco]. You know what I mean?

Stefanelli:     Yeah, yeah.

DePreta:        We, we, once Louie, I mean, once Mario went forward with trying to do something for me, they (UI) it.  Said listen, you're here until something happens and they, you're on, and then you're on your own.  And that's it.  That's what they told me and . . .

Stefanelli:     Now if they do something for you [make you a made member], you'll stay with [Capo] Louis [Filippelli] anyway.

DePreta:        Yeah, exactly.  Well that's what he said to me.  You know I had a talk with him.  I saw him yesterday, actually.

Stefanelli:     Louis [Filippelli]?

DePreta:        Yeah.

Stefanelli:     Supposedly a nice kid.  Everybody tells me nice things about him [Filippelli].

DePreta:        Yeah, he is, really, really.

Stefanelli:     Nice guy.

DePreta:        So, doesn't play any of that bullshit.

Stefanelli:     Oh yeah. Oh, good.

DePreta:        You know, like, I've seen him [Filippelli] for something.  He doesn't, when I talk to him I said, when do you want me to come down?  No, just come.  You know he's not like that, you know.  He doesn't pull any of that.

Stefanelli:     That's good.

11

Stefanelli:     That's good.

DePreta:      Mario's [Antonicelli's] good with him, you know.  He's
              easy, he's looking for me . . .

Stefanelli:   Yeah.

Finally, DePreta told Stefanelli in no uncertain terms that DePreta was

devoted to the Gambino Family and believed in its principles.  PSR ¶ 21.

DePreta:      'Cause I believe in . . .

Stefanelli:   Just tell him [i.e., an individual with a rival LCN Family]
              I'll be up there often.  And if you ever have a problem,
              just call for me.

DePreta:      I'm not looking just for this, I believe in . . .

Stefanelli:   I know.

DePreta:      . . . the whole, the whole thing.  I'm looking out for the
              principles of the Fam- . . .

Stefanelli:   The Family.  Yeah.

DePreta:      Yeah.

### 3.  Victim One's Subsequent Payments to DePreta

During the first week of February 2010, Victim One met again with DePreta,

who was accompanied by an individual believed to be co-defendant Michael Vitti.

PSR ¶ 22.  DePreta told Victim One that in addition to the first payment, Victim

One now had to pay for the previous year, when no payment was collected, after

Bauco went to jail.  When Victim One said that he did not have any more money,

DePreta stated, "Do what you could do."  *Id.*

On April 29, 2010, Victim One met with DePreta and Stefanelli at a

McDonald's restaurant in Stamford on East Main Street.  PSR ¶ 23.  Victim One

stated that he only had $500; the low amount caused both DePreta and Stefanelli

to laugh.  Victim One nervously explained that he did not have many bettors at

the time, and was trying his best to pay DePreta.  *Id.*  Victim One was so visibly

agitated from this meeting that he nearly walked into oncoming traffic.  DePreta

12

and Stefanelli later agreed that Stefanelli would take $300, and DePreta would take $200, from this small payment.  *Id.*

On January 6, 2011, Victim One paid an additional $1,600 to Uva, who collected the money on DePreta's behalf.  PSR ¶ 24.  The Title III intercepts disclose DePreta directing Uva to collect this payment from Victim One, with Uva arranging to meet DePreta at the same McDonald's.  Uva asked Victim One, "You owe him some money or something?"  Victim One handed Uva under the table $1,600 in cash in an envelope.  When Victim One inquired whether he had to make any more payments, Uva stated, "That's between you and him [i.e., DePreta]."  *Id.*

Afterwards, on January 18, 2011, DePreta met with Stefanelli at the wake of a former Gambino solider.  PSR ¶ 25.  On the consensually monitored recording, DePreta gave $1,000 of the money to Stefanelli, who asked, "Is this kid [i.e., Victim One] back in business?"  DePreta responded, "I guess so."  *Id.*

B.    Conspiracy to Operate a Lucrative Sports Gambling Business in Southern Connecticut

The Title III investigation, physical surveillance, and the statements of cooperating witnesses, among other sources of evidence, demonstrate that DePreta and Uva continuously operated a large-scale, lucrative illegal sports bookmaking business, since at least January 2008 until the arrest date of June 13, 2012, on behalf of the Gambino Family.  PSR ¶ 26.  The active involvement of several close associates, such as Thomas Uva, Jr., Douglas Corbin, Joseph Borea, John Liquori, and Domenico Manchisi, as well as a core group of sports bookmakers, including Michael Pepe, Daniel Degruttola, and Victor Amereno, was crucial to the success of their illegal activities.  The FBI Cryptanalysis Unit has analyzed the betting records of DePreta/Uva's sports bookmaking operation, and determined that the operation's total gross revenues from October 2010 to June

13

2011 alone was $1,692,564 (i.e., one discrete 38-week period during 4½ years of gambling operations).  *Id*.  At least five weeks during this 38-week period recorded a weekly profit from bettor losses in excess of $100,000 per week.  A search warrant executed on Uva's home at 12 Arlington Road in Stamford on April 28, 2011, recovered approximately $175,000 in cash; DePreta and Uva have agreed to forfeit this entire amount as criminal proceeds.[4]

The evidence demonstrates that DePreta was the leader of the large-scale sports bookmaking operation, and that Uva managed it as the "master agent." PSR ¶ 27.  On a day-to-day basis, Uva functioned as DePreta's eyes and ears. Title III surveillance, seized gambling records, and physical surveillance prove that they managed a cadre of trusted bookies who, in turn, had gamblers who would regularly place bets in the gambling operation.  Bettors placed their wagers on various sporting events on Costa Rica-based Internet websites entitled www.44wager.com or www.beteagle.com, or via associated toll-free telephone numbers.  *Id*.  The Title III intercepts reveal that Uva frequently called and spoke to www.44wager.com customer-service representatives in Costa Rica to manage the gambling activities of his and DePreta's bookies, and the bettors gambling under these bookies.  DePreta assumed a larger role when the bookmaking operation encountered major problems, such as dealing with problem bookies or bettors who had won large amounts of money.  *Id*.

Unlike most of his co-defendants in this case, DePreta exhibited impressive discipline in not making inculpatory statements over the wire surveillance.  PSR ¶ 28.  He was circumspect in his remarks and would often use his associates' telephones to avoid detection.  Most bookmakers in the

---

[4] **The government notes that DePreta's 2011 and 2012 income tax returns do not report any income derived from his illegal gambling businesses.**

organization did not share his discipline and made many incriminating statements over the telephone. *Id.* Physical surveillance used in conjunction with the wire surveillance revealed that the bookmakers regularly met with DePreta and Uva, usually at Uva's Stamford condominium, to drop off gambling profits.

Although DePreta left the day-to-day handling of the sports bookmaking business to Richard Uva, there was no question that DePreta was in control of the operation. PSR ¶ 29. For example, when a particular bookmaker (who eventually became a cooperating witness) accumulated a large debt to winning gamblers, DePreta intervened and took away this bookmaker's discretion to accept wagers. Similarly, DePreta became involved when co-defendant Anthony Santoro, who is a Bonanno Family associate of the LCN, took an aggressive posture in trying to collect a $28,000 debt. *Id.* DePreta and Uva believed that Santoro was manipulating wagers and reaping profits at their expense. Santoro enlisted the assistance of co-defendant Mitchell Engelson, a bookmaker in New York City, to collect this debt from DePreta and Uva. *Id.* In his statements over the wiretap, Engelson made it clear that he knew DePreta was the leader of the bookmaking operation:

ME: Listen, I'm talking to you as a friend now. When you're in this business, if you don't have a bankroll, you can't be in this business. I know that.

RU: $155,000. Last week.

ME: How much?

RU: $155,000.

ME: Yeah, all right, so, don't you got a shylock you could get money from for a week or two at a point? I mean, I mean, that's what Dean [DePreta], Dean, Dean could go to, who he has to go to [get the money]. I mean, that should have been done Monday.

> RU:   Yeah, I'll call you back.
>
> ME:   I'm just saying, I'm just saying.  You understand?
>
> RU:   But, listen, you could tell him that.  And I'll call you back.
>
> ME:   I'm not telling him [DePreta] nothing. [stuttering]  I can't tell him that.

Here, Engelson told Uva that DePreta should obtain a loanshark loan to cover these debts ("Yeah, all right, so, don't you got a shylock you could get money from for a week or two at a point?  I mean, I mean, that's what Dean, Dean, Dean could go to.").  PSR ¶ 30.  Engelson stated, however, that he would never directly criticize DePreta ("I'm not telling him [i.e., DePreta] nothing.").  During this call, Uva was audibly uncomfortable with Engelson's repeated references to DePreta's first name, as Uva's uniform practice during the Title III surveillance was to call DePreta "the kid" or "the guy" to protect his identity.[5]  *Id*.

The amounts of money being transacted on a weekly basis for the sports book were consistently high.  PSR ¶ 35.  For example, on the afternoon of December 20, 2010, Uva and co-defendant Michael Pepe discussed a financial discrepancy of $14,200 involving co-defendant Domenico Manchisi.  *Id*.

> RU:   Uh, you and I have a difference in a numbers and I'm trying to figure out why.
>
> *  *  *
>
> MP:   Okay, do you, did you have things higher or lower?
>
> RU:   Um, John Liquori gave me 8 [$8,000] and I guess Dom [Manchisi] was supposed to get 4 [$4,000].
>
> MP:   Uh, yeah we had 12 [$12,000] change was the final number.

_____

[5]  Although Uva claimed that the gambling operation was then purportedly in debt, DePreta's and Uva's bookies continued to accept illegal bets throughout this period.  DePreta and Uva had a consistent pattern of trying not to make big payouts to winning bettors.

RU:     Right, and I come up with . . . 14-2 [$14,200].

MP:     14-2 [$14,200]?

RU:     Yep.

Similarly, on March 28, 2011, Uva told co-defendant Michael Vitti,[6] "Uh, I just want to make sure I have this right.  Last week you gave him [DePreta] eight [$8,000], right?"  PSR ¶ 34.  Vitti responded, "No, ten [$10,000]."  Uva inquired further, "I know ten [$10,000] was last [week], I'm sorry.  Last week, the week before that you gave him eight [$8,000]?"  Vitti responded in the affirmative.  *Id*.

### C.     Conspiracy to Operate an Illegal Card Gambling Club at 2965 State Street, Hamden, Connecticut

Next, the evidence demonstrates that DePreta and Uva operated a Gambino-controlled card-gambling club at 2965 State Street in Hamden, Connecticut, known as "The Spot."  PSR ¶ 36.  George Norboe served as the regular manager of the club, and reported to John Liquori and Michael Pepe.  The club took a rake, or house percentage, out of every pot or hand.  *Id*.  The poker games were usually held on Tuesdays, Fridays, and Saturday nights.  The games began around 9:00 p.m. and would last for many hours, sometimes until 5:00 a.m.

The Hamden club was controlled by DePreta and Uva, supervised by Liquori, and affiliated with the Gambino Family.  PSR ¶ 37.  On October 25, 2010, Liquori and Uva discussed how the Hamden club had been profitable.  Liquori stated, "I just wanted to tell you.  I don't know how you guys made out the other day but we had, um, since Thursday, man, three or four serious nights down there.  Real good nights."  Pleased with this news, Uva stated, "Beautiful,

---

[6]   The Title III surveillance revealed that, on multiple occasions, Vitti stole custodial supplies, primarily liquid hand soap, from Westover Magnet Elementary School and gave them to DePreta and Uva for use in their restaurant, Westover Pizza, a few blocks down from the school at 234 Stillwater Avenue in Stamford.

beautiful." Liquori further stated, "We're all earning." Uva replied, "That's good news." *Id*.

The Title III surveillance discloses a violent confrontation in late October 2010 when three associates of the Genovese Family of LCN attacked the Hamden club. PSR ¶ 38. The Genovese associates wanted these players to return to play at the Genovese club in nearby West Haven. On October 25, 2010, co-defendant Douglas Corbin warned Uva about this impending attack on the Hamden club. *Id*. In turn, Uva warned Liquori that the Hamden club had to be ready for a violent confrontation. Uva told Liquori, "Now, just so you know, our other friend [DePreta] got a call to meet with somebody [from the Genovese Family] in the next few days, but that's just [LCN] politics shit, you know what I'm saying?" Liquori answered, "Yeah, yep, yep." Uva further stated, "Now hopefully . . . we'll get that [dispute] squashed, but between now and then, now and Thursday, you got to be extra careful and on your toes." Liquori replied, "You got it." *Id*.

On the evening of October 28, 2010, three Genovese associates drove up to the Hamden club in a box truck, banged on the door, threw rocks at the Hamden club building, and yelled at George Norboe through the intercom to open the door. PSR ¶ 39. According to Pepe's intercepted statements, "Three guys got out of the box truck and they were banging on the door. This was before me and John [Liquori] got there. They were banging on the door. George [Norboe] was shitting his pants and all the guys up there. We, we had a full table [of card gamblers] . . . . We had a couple of 50-year old business men and stuff like that. A couple of the guys were real nervous, they thought that the rocks that they were throwing at the windows were gun shots. George said one [gambler] almost called the cops. The dealer had to yell at the guy to tell him to put his fucking phone away and don't call the cops, you know." PSR ¶ 40. Pepe

explained that the bettors were shaking.  The Genovese associates were "yelling through the [intercom] speaker, to open the fucking door. We're taking everything inside."  Pepe further told Uva that Norboe had "obviously handled [the situation] like a pussy last night" and that "people are basically calling our bluff; they're saying that . . . you're not with [the Gambino Family]."  *Id.*

On October 29, 2010, Pepe told Uva that during the attack, one of the Genovese associates kept yelling the name of the "family restaurant," which was a coded reference to the Gambino Family.  Pepe told Uva, "You know the . . . name of the restaurant that we work at . . . . [Y]ou know like how I am, my family restaurant and your family restaurant [i.e. the Gambino Family]?"  Uva stated, "Yeah, yeah."  Pepe responded, "That we work for?  You know what I mean?"  Uva responded in the affirmative and directed Pepe to ensure that the Hamden Club opened that evening.  PSR ¶ 41.

The Hamden club did open on the evening of October 29, 2010.  PSR ¶ 42.  In fact, on that evening, Gambino Soldier Mario Antonicelli, DePreta, Uva, Liquori, and other associates met at the Hamden club, drove their cars to the Genovese-controlled West Haven club located at 37 Orlando Street, and entered the parking lot.  *Id.*  DePreta and his crew tried to force themselves into the West Haven club, but were denied entrance.  Approximately 30 minutes later, surveillance officers observed that the rear windshields of two vehicles in the West Haven club parking lot, a Lexus and a Jeep Cherokee, had been smashed out.  This confrontation served as a "show of force" from Antonicelli, DePreta, Uva, and other associates that the Gambino Family would protect its turf from the encroachments of other Families.  Afterwards, the Genovese Family made no further advances on the Hamden club.  *Id.*

19

### D.  DePreta's Involvement in Two Stamford Gambling Clubs

Finally, DePreta oversaw the gambling clubs at 514 Glenbrook Road and East Main Street in Stamford, even though he left the day-to-day management of these clubs to others.  PSR ¶ 43.  On the evening of April 28, 2011, both clubs were searched pursuant to federal warrant and yielded large amounts of gambling club paraphernalia such as gambling chips, decks of cards, table felt, and surveillance cameras.  PSR ¶ 45.  In fact, when the officers searched the East Main Club, DePreta's long-time associates Silverio Califano and Elliot Chiappetta were seated around a poker table with at least eight other men; Chiappetta was a regular card dealer at the East Main Club.  PSR ¶ 44.  In an intercepted conversation with Chiappetta on May 13, 2010, DePreta acknowledged his involvement in this gambling club:

> EC:   What's going on?
>
> DD:   I said, ah, shit.  Let me make some calls.  This is my only night when I have, when it's slow, when I can actually think.
>
> EC:   When are we gonna go out, June?
>
> DD:   I don't know.  One of these days, June.  Where are you?
>
> EC:   I'm up at East Main Street [Club] . . . I might work tonight.
>
> DD:   Don't you know that once you get involved with us, you don't get paid?
>
> EC:   Ha.
>
> DD:   Doesn't he know that we don't pay?
>
> EC:   I can't hear you.
>
> DD:   I said, doesn't he know we don't pay?
>
> EC:   Ha, ha.
>
> DD:   You didn't fill him in yet, June?
>
> EC:   No, no.  I mean this puts money in my pocket, too.

## III.   DePreta's Guideline Calculation and Criminal History Category

### A.   DePreta's Stipulated Total Offense Level Is 23

On June 5, 2013, the defendant pleaded guilty to one count of Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d), as charged in Count One of the Superseding Indictment, based on the three predicate racketeering acts discussed above (i.e., conspiracies to commit extortion, to operate a sports bookmaking operation, and to operate a card gambling club).  Under the terms of his plea agreement, the defendant and the government agree that his total offense level is 23, which reflects a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  PSR ¶ 75.

### B.   The Evidence Warrants an Upward Departure From CHC III to CHC IV

As set forth in the plea agreement, the defendant and the government disagree about his Criminal History Category ("CHC").  The defendant represents that he should be scored as CHC III, and will not argue that he qualifies as CHC II. DePreta Sent Mem. at 2-3.  Consistent with the terms of the plea agreement,[7] the government respectfully submits that the defendant should receive an upward departure from CHC III to CHC IV because "reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  U.S.S.G. § 4A1.3(a)(1).

In general, a sentencing court may depart from the Sentencing Guidelines if it determines "that there exists an aggravating or mitigating circumstance of a

---

[7] Page six of the plea agreement states: "Furthermore, the Government shall argue to the Probation Office and to the Court, pursuant to U.S.S.G. § 4A1.3, for a one-level upward departure to CHC IV because CHC III substantially under-represents the seriousness of the defendant's criminal history, or the likelihood that he will commit other crimes, in light of the government's view that the defendant has been involved continuously in organized crime."

kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b).  The Second Circuit Court of Appeals ("Second Circuit") has held that the inadequacy of a defendant's criminal history category is an "encouraged basis" for an upward departure.  *See United States v. Simmons*, 343 F.3d 72, 78 (2d Cir. 2003) (citing *Koon v. United States*, 518 U.S. 81, 94-95 (1996).  In deciding whether to impose a departure on a ground that is an "encouraged basis," a sentencing court asks, "[w]hat features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case[.]"  *United States v. Gayle*, 389 F.3d 406, 409 (2d Cir. 2004) (quoting *Koon*, 518 U.S. 81, 94-95 (1996)).  Then, "[i]f the special factor is an encouraged factor, the sentencing court is authorized to depart if the applicable Guideline does not already take it into account."  *Id.* (quoting *Koon*, 518 U.S. at 96).[8]

The Second Circuit has held that a district court may upwardly depart from a defendant's CHC where the defendant is a recidivist with a propensity to continue on a course of criminal conduct.  *See United States v. Kassar*, 47 F.3d 562 (2d Cir. 1995), *abrogated on other grounds by Spencer v. Kemna*, 523 U.S. 1 (1998), and *United States v. Mercurris*, 192 F.3d 290 (2d Cir. 1999).  In *United States v. Gayle*, the Second Circuit held that recidivism is best gauged by considering the defendant's *entire record* to determine whether it involves factors

---

[8]  Section 4A1.3(a)(2) provides five non-exhaustive factors that the district court may consider when determining whether an upward departure of the CHC is warranted, such as whether a prior sentence was not used in computing a defendant's CHC.  *See* U.S.S.G. § 4A1.3(a)(2)(A).  Significantly, section 4A1.3(a)(2) "states that [reliable] information *may include, but is not limited to*, information concerning [these five possible categories]."  *United States v. Cox*, 299 F.3d 143, 146 (2d Cir. 2002) (emphasis added) (internal quotations omitted) (citation omitted).  *See also United States v. Cervantes*, 878 F.2d 50, 55 (2d Cir. 1989).  The Second Circuit has affirmed that the five categories of information listed in section 4A1.3(a)(2)(A)-(E) do not constitute an exhaustive list.  *See Cox*, 299 F.3d at 146.

not adequately taken into consideration by the Sentencing Commission.  389 F.3d at 410.  There, the *Gayle* defendant had committed the same offense repeatedly and proximately in time, and left "ample evidence of [his] dogged criminal persistence."  *Id*.  In concluding that the "factors bearing on recidivism were outside of the guidelines as reflected by his otherwise applicable criminal history category," the Second Circuit held that the record in *Gayle* "amply support[ed] a one-level upward departure in criminal history category."  *Id*. at 410-11.  *See also United States v. White*, 552 F.3d 240, 253 (2d Cir. 2009) (affirming upward departure of CHC due to the defendant's "many convictions and the regularity with which he committed crimes"); *cf. United States v. Tropiano*, 50 F.3d 157, 163 (2d Cir. 1995) (finding that "concerns over recidivism and incapacitation" are the "core concept of criminal history, and fall squarely under § 4A1.3") (internal quotations omitted).

While the Second Circuit in *Gayle* was not persuaded that a person who repeatedly commits the same offense is necessarily more likely to re-offend than a person who has committed different crimes, several other Circuit Courts of Appeals have "concluded that [the] similarity between previous convictions and the charged offense supports a finding of an inadequate criminal history level." *United States v. Schmude*, 901 F.2d 555, 559 (7th Cir. 1990) (holding that similarity between previous convictions and the charged offense supported a finding of inadequate criminal history level for the defendant, but that actual degree of departure by district court was unreasonable because sentence imposed was more than twice the top of the applicable Guideline range).  *See, e.g., United States v. Paredes*, 87 F.3d 921, 927 (7th Cir. 1996) ("The district court . . . acted properly in finding that her criminal history category inadequately represented her increased risk of recidivism based upon the fact that [defendant] had

23

committed almost the identical crime two previous times."); *United States v. De Luna-Trujillo*, 868 F.2d 122, 125 (5th Cir. 1989) ("The recidivist's relapse into the same criminal behavior demonstrates his lack of recognition of the original wrongs, entails greater culpability for the offense with which he is currently charged, and suggests an increased likelihood that the offense will be repeated yet again. . . . [T]he similarity between the two offenses provides the district court with additional reason to enhance the sentence under section 4A1.3."); *United States v. Chavez-Botello*, 905 F.2d 279, 281 (9th Cir. 1990) ("Since the similarity between the prior and current offenses is not considered when computed the criminal history category, a departure for this reason is permissible.").

The government respectfully submits that the evidence demonstrates that the defendant is a recidivist felon with a strong propensity to return to the same course of criminal conduct.  From 1997 and 2012, albeit with a respite for incarceration, the defendant has repeatedly engaged in the core criminal acts of racketeering, extortion, and operating an illegal gambling business.  For his first three convictions, the defendant was incarcerated from 2002 until October 2004, when he was released to a halfway house until November 26, 2004.  While on supervised release until November 27, 2007, the defendant repeatedly told the Probation Office that he was working lawfully and had no interest in returning to illegal sports bookmaking.  PSR ¶ 38.  These statements were untrue, as the defendant had returned to illegal gambling businesses as early as 2006.  PSR ¶¶ 7, 79.  Most strikingly, DePreta's own statements to Soldier Stefanelli that he believed in "the whole thing," and that he was "looking out for the principles of the [Gambino] Family," further corroborate DePreta's heightened risk of recidivism.  In sum, because DePreta committed the same essential offenses repeatedly and proximately in time, and has provided "ample evidence of [his]

dogged criminal persistence," *Gayle*, 389 F.3d at 410, the Court should depart upward one level from CHC III to CHC IV.

Accordingly, with a CHC IV, a total offense level of 23 results in a range of 70 to 87 months of imprisonment (sentencing table) and a fine range of $10,000 to $100,000, U.S.S.G. § 5E1.2(c)(3).  The defendant is also subject to a supervised release term of 1 to 3 years.  U.S.S.G. § 5D1.2.

**IV.   A Sentence of 78 Months of Incarceration Range Would Achieve
Incapacitation, Just Punishment, and Appropriate Deterrence**

**A.   Applicable Law**

Although the Sentencing Guidelines are no longer mandatory, they must be considered by the Court along with the other factors listed in 18 U.S.C. § 3553(a). United States v. Booker, 543 U.S. 220, 260-61 (2005); United States v. Crosby, 397 F.3d 103, 110 (2d Cir. 2005).  Ultimately, a district court's sentence is reviewed for reasonableness.  Booker, 543 U.S. at 260-61; Crosby, 397 F.3d at 114-15. Reasonableness is a flexible concept, and district courts are given latitude in their exercise of discretion to fashion an appropriate sentence, even a non-Guidelines sentence.  See United States v. Jones, 460 F.3d 191 (2d Cir. 2006).  But reasonableness does not result in unfettered discretion to ignore the Guidelines, and the Second Circuit has recognized post-*Booker* that the Guidelines remain highly instructive in determining a reasonable sentence: "In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress."  United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006).

Title 18, United States Code, Section 3553(a) provides, in pertinent part, that:

**(a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--**

**(1) the nature and circumstances of the offense and the history and characteristics of the defendant;**

**(2) the need for the sentence imposed–**

> **(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

> **(B) to afford adequate deterrence to criminal conduct;**

> **(C) to protect the public from further crimes of the defendant; and**

> **(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

> **\* \* \***

**(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and**

**(7) the need to provide restitution to any victims of the offense.**

### B.    The Nature and Circumstances of the Offense

The defendant's instant offense conduct represents a major escalation of his criminal conduct and a continuing disrespect for the rule of law.  Contrary to the defense's effort to depict DePreta as peaceful and non-violent, his extortionate collections of tribute payments were crimes predicated on violence, intimidation, and fear.  In his plea agreement, the defendant stipulated that he had conspired to commit larceny by extortion in violation of Conn. Gen. Stat. §§ 53a-122 and 53a-119(5).  Extortion is a crime of violence.  *See , e.g., United States v. Agnello*, 101 F.Supp.2d 108, 110 (E.D.NY. 2000) ("[E]xtortion . . . [is a] crime of violence . . . .").  Section 53a-122(a)(1) proscribes the wrongful taking of an

individual's property by extortion.  Conn. Gen. Stat. § 53a-122(a)(1).  In turn, section 53a-119(5) defines this crime as when a person "compels or induces another person to deliver such property to himself or a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will: (A) [c]ause physical injury to some person in the future . . . ."  Conn. Gen. Stat. § 53a-119(5).

The evidence demonstrates that DePreta intimidated Victim One to make tribute payments to him because Victim One was running a non-Gambino-affiliated sports bookmaking business in Gambino territory.  DePreta had no legal right, contractual or otherwise, to demand these payments from Victim One or other independent sports bookmakers.  Rather, Victim One was fearful of the defendant and the consequences to his safety if he did not pay him.  In particular, Victim One knew that DePreta was associated with organized crime, and he had previously gone to prison.  It is common knowledge in the gambling community that organized crime families use violence to achieve their objectives, and that organized crime exerts control over the illegal gambling market .  As a result, Victim One was so agitated that he almost walked into vehicular traffic during one of these payment meetings.  In short, DePreta did not use violence against Victim One because his reputation and widely known affiliation with organized crime provided all the coercive leverage he needed to extort these payments.

The escalating nature of the defendant's criminal conduct is even more salient when the Court considers DePreta's expanding footprint in illegal gambling in southern Connecticut during the last decade.  From 1997 to 2001, DePreta was part of a medium-sized bookmaking operation in Stamford and was tasked with, among other things, collecting losses from gamblers.  In contrast, from 2008 to 2012, DePreta had become the undisputed leader of a large,

lucrative bookmaking operation that reached not only into Fairfield and New Haven Counties, but also into New York City.  The bookmaking operation produced enormous tax-free profits for DePreta, Uva, their bookmakers, and the Gambino Family.  If one were to extrapolate the $1,692,564 in profits recorded during the 38-week period from 2010-2011 over the four-year period (208 weeks) specified in the Superseding Indictment, the total profits would be in excess of $9,000,000.

Moreover, on top of the lucrative sports book, DePreta operated the three gambling clubs in Stamford and Hamden, and derived illegal revenue from those entities.  The Hamden club, which was perceived as a threat by local Genovese Family associates, reflects DePreta's growing stature in the Gambino Family.  On the night after the Genovese attack, Soldier Mario Antonicelli, DePreta, Uva, Liquori, and other Gambino associates met at the Hamden club, drove their cars to the Genovese-controlled club located at 37 Orlando Street in West Haven, and entered the parking lot.  DePreta and his crew tried to force themselves into the West Haven club, but were denied entrance.  Approximately 30 minutes later, surveillance officers observed that the rear windshields of two vehicles in the West Haven club parking lot, a Lexus and a Jeep Cherokee, had been smashed out.  This "show of force" orchestrated by DePreta protected the Gambino-controlled Hamden club from further encroachments from the Genovese Family.

C.    History and Characteristics of the Defendant

The evidence demonstrates that DePreta is a recidivist offender who has effectively chosen a life of crime with the Gambino Family over his desire to be with, and to be there for, his biological family.  When he was sentenced in 2002, the PSR succinctly captured the stark choice that he faced:

> [A]s has been discussed with the defendant, many of those in the
> Stamford criminal community almost inexplicably choose to

28

continue criminal endeavor often times without any consideration of the consequences.  As has been the cases with many of those who have preceded him the Stamford bookmaking scene, involvement with the justice system proves to be little more than an 'occupational hazard.'  DePreta's situation appears at this time to be no different than any of his counterparts, yet his youth, employment status and strong family will hopefully bode well for his 'prognosis.'  In the end, the defendant must choose between a life of looking over his shoulder and associating with those who act as a 'lightning rod' for law enforcement inquisition or realizing that his family must be a priority to the exclusion of these associations.

2002 PSR ¶ 91.  The sentencing judge in 2002 further stressed to DePreta that he had to choose either his biological family or the Gambino Family.  There was no in-between.

The evidence reveals unequivocally that DePreta chose to prioritize his criminal association with the Gambino Family, and his fervent desire to become a "made member" thereof, over his biological family.  In the process, he deceived the experienced senior probation officer who supervised his release from 2005 to 2007, falsely claiming to have renounced his criminal past in favor of a law-abiding life.  As his instant PSR recognizes, the defendant "is either unable or unwilling to disassociate himself from his criminal ties, and has persisted in illegal behavior."  PSR ¶ 126.

Instead, DePreta has evolved into a seasoned, disciplined criminal.  In August 1997, the defendant was impulsive, as evidenced by his rash confrontation with the auto-parts delivery man who had argued with his father, Vincent.  The defendant brought two other men with him to the delivery man's work place, stating impetuously, "I don't give a fuck about witnesses; you talk to my father that way, I'm going to rearrange your face."  *Id*.  The delivery man was so fearful for his safety that his boss placed him in a locked room to protect him from DePreta.  In contrast, when collecting payments from Victim One in 2010, the defendant was now astute enough to let his reputation and association with

29

the Gambino Family serve as the leverage for compelling payment, rather than violence and threats.  The Title III surveillance also disclosed DePreta's impressive discipline in avoiding, unlike his co-defendants, the utterance of incriminating statements over the telephone.

Finally, the evidence reflects DePreta's growing stature in the Gambino Family and his intense desire to become a made member of the Family.  DePreta met regularly with three Soldiers of the Gambino Family during the course of this investigation: Mario Antonicelli, Louie Ricco, and the deceased Nicolas Stefanelli.  DePreta's recorded statements reveal that he reported regularly to Antonicelli, and had met with Louis Filippelli, a capo (or captain) of the Gambino Family in New York City.  The investigation further corroborates that DePreta would meet with his Gambino Family superiors, primarily Antonicelli, to pay monetary tribute to improve his prospect for becoming a "made member" of the Family in the future.  The defendant was surveilled many times and even photographed in the company of these Gambino Soldiers, who were considerably older than him.[9]  The defendant expressed his devotion to the Gambino Family when telling Stefanelli on January 30, 2010, "I believe in the whole, the whole thing.  I'm looking out for the principles of the Family."  PSR ¶ 21.

In light of the above discussion, the government respectfully submits that DePreta should be incapacitated for 78 months because it is extremely likely that

---

[9]  In the attached Exhibit A, DePreta was photographed with Mario Antonicelli and Louie Ricco at the Villa Amalfi restaurant, 793 Palisade Avenue, Cliffside Park, NJ, on December 1, 2009.  In Exhibit B, DePreta was photographed with Antonicelli at the Athena Diner, 3350 Post Road, Southport, CT, on October 2, 2010.  In Exhibit C, DePreta was photographed with Antonicelli at Thornwood Coach Diner, 525 Kensico Road, Thornwood, NY, on April 27, 2011.  In Exhibit D, DePreta is with Antonicelli and Nicholas Stefanelli at 79-81 Davenport Avenue, Newark, NJ, on November 7, 2011.  These photographs were previously submitted by the government at the defendant's previous detention hearings.

he will return to criminal activity after serving the Court's sentence.  He had a genuine opportunity in 2002 to turn his life around, but he rejected it.  By his actions and his own words, DePreta has proven that he is powerless to resist the allure of organized crime and can be expected to return to his criminal livelihood in the future.

 D. **The Sentence Must Promote Respect for the Law and General Deterrence**

 The sentence in this case must reflect the seriousness of the offense committed by the defendant, and provide a message of deterrence to all individuals engaged in racketeering, extortion, and the operation of illegal gambling businesses, particularly to those individuals affiliated with organized crime.  The Court must consider in imposing sentence the need for the sentence to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B). Unsurprisingly, the operation of illegal gambling businesses, particularly sports bookmaking rings, continues to be commonplace in Connecticut.  To this day, extortion and illegal gambling remain two of the primary sources of revenue for organized crime and allow such criminal enterprises to remain relevant in this day and age.  A 78-month custodial sentence is particularly warranted, so that other Gambino Family members and associates, some of whom shall be released from Bureau of Prisons custody in the near future, will take note.  Hence, the government submits that a custodial sentence of 78 months of imprisonment is needed to communicate an appropriate message of general deterrence.

## CONCLUSION

In closing, the government respectfully submits that the defendant should be sentenced to 78 months of imprisonment.  Such a sentence would be consistent with the appeal waiver in the plea agreement [doc. 612 at p. 7].

Respectfully submitted,

MICHAEL J. GUSTAFSON
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY CONFERRED
BY 28 U.S.C. SECTION 515


 /s/
HAROLD H. CHEN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT24432

PETER S. JONGBLOED
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT03192
1000 LAFAYETTE BLVD., 10th FLOOR
BRIDGEPORT, CONNECTICUT  06604
(203) 696-3000

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2013, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/
_____
**HAROLD H. CHEN
ASSISTANT UNITED STATES ATTORNEY**